**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOAN CALLUM, | : | NO. 3:02CV-0057 (AHN) |
| *plaintiff,* | : | |
| | : | |
| V. | : | |
| | : | |
| TOWN OF COLCHESTER, *et al.,* | : | |
| *defendants.* | : | May 5, 2004 |

**AFFIDAVIT OF GUDRUN JOHNSON**

I, Gudrun Johnson, being of sound mind and legal age, and having been duly sworn, do hereby depose and say:

1. For the purposes of identification, my full name is Gudrun Kirsten Johnson. I am currently employed by the State of Connecticut, Department of Public Safety, Division of State Police. I have been so employed for about ten years.

2. My current rank is Trooper First Class. I have held this rank for about one year. I am assigned as a Detective in the Department of Public Safety, Special Licensing and Firearms Unit at Public Safety Headquarters, 1111 Country Club Road, Middletown, Connecticut. I have been so assigned for about one year.

3. On December 20, 2000, I held the rank of Trooper First Class and was assigned to the uniformed patrol division at the Danielson State Police Barracks (Troop D). I was working the midnight shift which began at about 12:00 p.m. on December 20, 2000, and continued until about 8:00 a.m. the following morning, December 21, 2000.

4. While on patrol during the early morning hours, I was contacted via radio by the Troop D desk officer and instructed to go to the Colchester State Police Barracks (Troop K) to

assist a male trooper with a urine test involving a female motor vehicle operator who had been arrested for driving while under the influence of alcohol or drugs. State Police policy prohibits a male trooper from supervising a female arrestee while she gives a urine sample. Apparently, I was the only available female trooper on duty in the eastern part of the state, so I was the logical choice to assist in the more personal aspects of the female's arrest processing.

5. Upon arrival at Troop K, I met with Trooper Joseph Marsh who introduced me to Joan Callum. Trooper Marsh explained that Ms. Callum had been arrested for driving a motor vehicle while under the influence of alcohol or drugs, and that, according to statute, he was required to obtain urine samples from her. The samples were intended to be used as evidence in his case.

6. Consistent with standard protocol, I escorted Joan Callum to a secure lavatory facility where I instructed her to urinate in a standard sample bottle. Joan Callum was angry and uncooperative at this time, insisting that she was not drunk. Joan Callum was initially hesitant to provide the required urine sample. However, I suggested to her that if she was indeed innocent as she was saying, the sample would help to exonerate her. Following this, Ms. Callum agreed to give the urine sample as requested.

7. After the urine sample was given, the bottle was sealed and returned to Trooper Marsh. Because Ms. Callum was required to give a second urine sample thirty minutes following the first one, I remained at Troop K in order to assist.

8. While Trooper Marsh was completing the arrest paperwork for Ms. Callum, I had occasion to inspect her Connecticut Operator's License. I observed that the license had "B" restrictions placed upon it -- indicating that Ms. Callum was required to wear corrective lenses while operating a motor vehicle. I informed Trooper Marsh of my observation. Through my

2

personal observation and discussion with Ms. Callum, I learned that she did not have any

eyeglasses, and was not wearing contact lenses.  Accordingly, at the time she was stopped by

Trooper Marsh, she was operating her vehicle in violation of Connecticut law -- specifically,

Connecticut general Statutes § 14-36(f).

9.  Upon the expiration of thirty minutes, I escorted Joan Callum back to the bathroom

where she gave a second urine sample using the standard sample bottle.  This sample, like the

first, was sealed and returned to Trooper Marsh for processing.

10.  Throughout the arrest processing, Trooper Marsh conducted himself in a businesslike

manner in his dealings with Ms. Callum.  While I was present at Troop K, Joan Callum never

mentioned in my presence that she was diabetic or that she had any physiological or

psychological reason why she might act, or operate a motor vehicle, in an erratic manner.

11.  I never had the opportunity to observe Joan Callum on Route 2 at the scene of her

arrest.  I did not meet her until some time after she had been transported to the Colchester State

Police Barracks for arrest processing.  Therefore, I have no knowledge whatsoever regarding the

justification for her arrest.

I have read the foregoing affidavit consisting of three pages.  It is true and accurate to the

best of my knowledge.

_/s/_____
Affiant

Subscribed and sworn to before me this _____ day of _____, _____.

__/s/_____
Notary Public/Commissioner of the
Superior Court