UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOAN CALLUM, | : | NO. 3:02CV-0057 (AHN) |
|    *plaintiff,* | : | |
| | : | |
| V. | : | |
| | : | |
| TOWN OF COLCHESTER, *et al.,* | : | |
|    *defendants.* | : | May 4, 2004 |

## AFFIDAVIT OF ARTHUR SPADA

I, Arthur Spada, being of sound mind and legal age, and having been duly sworn, do hereby depose and say:

1. For the purposes of identification, my full name is Arthur L. Spada. I am currently employed by the State of Connecticut as the Commissioner of Public Safety. I have been so employed for about four years.

2. In my position as the Commissioner of Public Safety, I am responsible for all of the activities of more than 1,110 sworn State Police Troopers as well as hundreds of other non-sworn civilian personnel. My office is located at the headquarters for the Department of Public Safety at 1111 Country Club Road in Middletown, Connecticut. In addition to the headquarters complex, I supervise 12 State Police barracks located throughout the State of Connecticut, the Mulcahy State Police Complex located at 294 Colony Street in Meriden, Connecticut, home of a number of specialized units including the State Police Forensics laboratory, the State Police portions of the Connecticut Police Academy located at 285 Preston Street in Meriden, Connecticut, the State Toxicology Laboratory located at 10 Clinton Street in Hartford, and numerous other offices and training facilities located throughout the state.

3. On December 20, 2000, the defendant in this case, Trooper Joseph Marsh, was assigned as a uniformed patrol trooper at the Colchester State Police Barracks. At the time of the incident which is the subject of this lawsuit, he had been a Connecticut State Police trooper for approximately two years.

4. At that same time, Trooper Gudrun Johnson, a co-defendant in this lawsuit, was assigned as a uniformed patrol trooper at the Danielson State Police barracks, and had been employed as a Connecticut State Police Trooper for approximately six years.

5. All Connecticut State Police troopers undergo approximately 29 weeks of basic training at the Connecticut State Police Academy in Meriden, Connecticut. The State Police basic training program meets or exceeds all requirements of the Connecticut Police Officer Standards and Training Council (POSTC). In addition, the Connecticut State Police is certified as an accredited law enforcement agency by the Commission on Accreditation for Law Enforcement Agencies (CALEA). As such, all aspects of State Police operations, including our training curriculum, both basic and in-service, are required to meet or exceed rigorous national standards applicable to all law enforcement agencies. A significant portion of a trooper's basic training involves learning the laws of arrest, motor vehicle enforcement standards, and drunk driving enforcement.

6. Following basic training, newly appointed Connecticut State Police troopers undergo 6 to 10 weeks of field training under the direct supervision of a certified Field Training Officer (FTO). During his or her filed training, a newly appointed trooper is required to demonstrate, among many other things, understanding and proper execution of the laws of arrest, motor vehicle and traffic enforcement techniques, and drunk driving enforcement.

7. Upon completion of their field training, all patrol troopers are assigned to a platoon where their activities are directly supervised by a shift supervisor (sergeant), and indirectly supervised through the chain of command by a barracks commander (lieutenant), a district commander (captain or major), the Commander of Field Operations (lieutenant-colonel), the Commander of the State Police (colonel), and ultimately by myself, the Commissioner of Public Safety. While so assigned, all troopers are also required to undergo periodic in-service training which meets or exceeds state statutory requirements.

8. During the course of their employment, the performance of each trooper is evaluated on an annual basis by his or her direct supervisors. If performance deficiencies are noted, a trooper may receive a Performance Observation Report (POR) at any time, however, and may be required to undergo remedial training designed to rectify a particular problem noted in such a report. If the problem is serious enough, a trooper's employment may even be terminated as a result of inferior performance.

9. I did not directly supervise either Trooper Marsh or Trooper Johnson on December 20, 2000. Other than what I learned through the complaint filed in this lawsuit, I have no personal knowledge concerning either of their activities on the night in question. Moreover, neither of the troopers' supervisors ever brought to my attention any job-related performance deficiency regarding either Troopers' activities on December 20, 2000.

10. While, at the time, I had no personal knowledge concerning the quality of performance exhibited by either trooper, my review of their personnel files up to December 20, 2000, the date of the incident which is the subject of this lawsuit, reveals that neither trooper had ever been disciplined for substandard performance of any type. To the contrary, Trooper

Marsh's records indicate that he was properly trained and certified in the use of traffic control radar and laser devices, and was experienced in the use of such equipment. His records also indicate that Trooper Marsh had been cited for superior performance in drunk driving enforcement in 2000 -- the same year in which the plaintiff, Joan Callum, complains that she was treated inappropriately. Based upon my review of their personnel files, I find no basis upon which I could have concluded that either Trooper's performance was likely to be anything other than exemplary on the night of the plaintiff's arrest.

      11. It is the policy of the Connecticut State Police that all troopers fully comply with the law while executing their official duties on behalf of the State of Connecticut. Where troopers demonstrate an inability to understand the law or to comply with its dictates, the Department of Public Safety has well-established methods by which such instances of substandard performance are investigated, documented and dealt with, either through retraining, disciplinary action or termination of employment. Based upon the exacting training standards to which all Connecticut State Police troopers are held, my lack of personal knowledge concerning the actions of Troopers Marsh and Johnson on December 20, 2000, and upon the absence of any record of substandard performance prior to that date on the part of either trooper which might have formed the basis for closer scrutiny of their professional performance, I was not required to take any action whatsoever to address a perceived work-related deficiency on their parts.

I have read the foregoing affidavit consisting of five pages.  It is true and accurate to the best of my knowledge.

                                                                                                               /s/_____
                                                                                                                Affiant

Subscribed and sworn to before me this _____ day of _____, _____.

                                                                                                         /s/_____
                                                                                    ~~Notary Public~~/Commissioner of the Superior Court