**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **JOAN CALLUM** | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **3:02 CV 57 (AHN)** |
| | : | |
| **VS.** | : | |
| | : | |
| **JOSEPH MARSH;** | : | |
| **GUDRUN JOHNSON; and** | : | |
| **ARTHUR SPADA** | : | |
| **Defendants** | : | **JANUARY 17, 2005** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**OBJECTION TO MOTION FOR SUMMARY JUDGMENT**

**A.    FACTUAL BACKGROUND**

This action for violation of civil rights made actionable pursuant to 42 U.S.C. §§ 1983 and 1988 arises out of a December 20, 2000 incident wherein the Plaintiff Joan Callum was arrested by Defendant Connecticut State Police Trooper Joseph Marsh for allegedly speeding, driving under the influence of alcohol or drugs, and operating a motor vehicle outside of her license restrictions (corrective lenses).

Late in the evening of December 20, 2000, the Plaintiff Joan Callum and two friends were traveling westbound on Route 2 near exit 16 in the Town of Colchester. It was a frigid, frigid evening.

When the Plaintiff was stopped by the State Police, she was immediately and repeatedly asked whether she had been drinking or had taken drugs. The Plaintiff repeatedly told Defendant Trooper Marsh that she had not been drinking and that she

1

does not drink.  She denied taking drugs.

The Plaintiff had her car window rolled down, allowing the frigid air to enter her vehicle, and Defendant Marsh was shining his bright flashlight into the vehicle when the Plaintiff's eyes had become accustomed to the dark night.

In spite of the Plaintiff's repeated and consistent denials as to whether she had been drinking, in spite of the Defendant's being informed that the Plaintiff was a diabetic, and in spite of the dangerously cold temperatures, the Plaintiff was told to step from her vehicle to perform a number of field sobriety tests.  It is important to note that at no time did any law enforcement officer detect any odor of alcohol about the Plaintiff.

The Plaintiff performed some of the field sobriety tests properly but had difficulty performing others due to the frigid temperatures and her lack of understanding what the word "pivot" means.

The Plaintiff was then told that she was being arrested for "drunk driving" and "drugs."  Her car was towed while she was transported to Troop K in Colchester.

The Plaintiff submitted to two urine toxicology tests.  The test results were negative for alcohol or drugs.

**B.    STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, a party moving for Summary Judgment bears a heavy burden.  The movant must clearly and unequivocally demonstrate the lack of any genuine issue of material fact, and that it is entitled to

judgment as a matter of law.  Rule 56 (c). Fed. R. Civ. Pro.    "On summary judgment, the inferences to be drawn from the underlying facts contained in [the pleadings and other supporting documents] must be viewed in the light more favorable to the party opposing the motion."  United States v. Diebold, 369 U.S. 654, 655 (1962).

"In determining whether summary judgment was appropriate, we resolve all ambiguities and draw all reasonable inferences against the moving party."  Lefcourt v. United States, 125 F.3d 79,82 (2nd Cir. 1997).

The function of the court is not to resolve issues of fact, but merely to determine if such issues exist.  Rodriquez v. Board of Ed. Of  Eastchester Univ. Free School, 620 F.2d 362 (2nd Cir. 1980).  If the movant fails to meet its burden, then the motion for summary judgment must be denied.


**C.    LEGAL ARGUMENT**

**1.    Defendants Had No Probable Cause To Arrest Plaintiff For the Charges Filed Against Her**
The validity of a warrantless arrest, and the existence or non-existence of probable cause, is a matter determined by the court according to state law.  See Doe v. Bridgeport Police Dept, 198 F.R.D. 325, 335-36 (D. Conn.  2001); United States v. Fisher, 702 F.2d 372, 375, n.6 (2d Cir. 1983).  In Connecticut, "[p]robable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of

reasonable caution to believe that a felony has been committed . . . The probable cause test then is an objective one." State v. Jenkins, 82 Conn. App. 111, 115  (2004), quoting State v. Clark, 255 Conn. 268, 292-93, 764 A.2d 1251 (2001).  Probable cause to arrest is determined at the time of the arrest.

Ms. Callum was charged with three violations of Connecticut General Statutes:

1.     operating a motor vehicle under the influence of alcohol or drugs, in violation of Conn. Gen. Stat. § 14-227a;

2.     speeding, in violation of Conn. Gen. Stat. § 14-219c

3.     operating a motor vehicle outside of her license restrictions, in violation of Conn. Gen. Stat. § 14-36(f).

Connecticut General Statutes § 14-227a makes it an offense to operate "a motor vehicle on a public highway of this state … (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content."  The Plaintiff was arrested following her performance on standardized field sobriety tests for operating a motor vehicle "while under the influence of intoxicating liquor or any drug."

When Defendant Marsh initiated the stop of Ms. Callum's vehicle, he noted that it took her some time to pull over.  However, Ms. Callum could not immediately safely pull over due to snow and ice, a fact that would also have been evident to Defendant Marsh. Exhibit A, January 15, 2003 Deposition of Joan Callum, pp. 37-38;  Exhibit B, January

4

15, 2003, Deposition of Imla Eubanks p. 16.  Given the condition of the shoulders of

Route 2, no reasonable person would have immediately pulled over onto the shoulder.

In deciding to arrest the Plaintiff for DUI, Defendant Marsh allegedly observed

Ms. Callum's "great difficulty" in producing her license, registration and insurance card.

She appeared "very disoriented, and her eyes were bloodshot and glossy in

appearance."  Ms. Callum  "seemed to turn away and become evasive about letting me

look at her face."  In addition, "she appeared to be wobbling back and forth in the front

seat.  Police Report, Exhibit A to Defendants' Memorandum of Law.

Prior to observing any of those things, however, Defendant Marsh immediately

accused Ms. Callum of being drunk and/or on drugs and continued badgering her for at

least twenty minutes.  Exhibit. A,  Deposition. <u>Callum</u>, pp. 43-4; Exhibit. B.,  Deposition.

<u>Eubanks</u>, pp. 17-20.  Ms. Callum had her driver's side window rolled down the entire

time she was being harangued by Defendant Marsh, causing the frigid air to enter her

car.

Mrs. Callum was uncertain how long it took her to produce her license,

registration and insurance cards, because after the twenty minutes of accusations, she

was very shaken and upset.  Exhibit. A, Deposition. <u>Callum</u>, p. 52.  One of her

passengers saw nothing unusual in the time it took Ms. Callum to produce the

documents.  Exhibit. B, Deposition. <u>Eubanks</u>, pp. 20-21.

Although she looked at the Defendant's flashlight when ordered to, Exhibit. A, Deposition. <u>Callum</u>, pp. 44-47; Exhibit B,  Deposition. of <u>Eubanks</u>, p. 18-19, the bright light was disturbing to Ms. Callum.  She was not told she was being subjected to a "test," she was just continually told to look at the light or to follow his pen.

Defendant Marsh then attempted to administer three standardized field sobriety tests.  These field sobriety tests were developed by the National Highway Traffic Safety Association ("NHTSA") for use by police officers nationwide:  the horizontal gaze nystagmus, the walk and turn, and the one leg stand.

When the tests are not administered in the prescribed, standardized manner, the validity of the test is compromised.  Exhibit C, National Highway Traffic Safety Administration, PRINCIPLES AND TECHNIQUES OF TRAINING IN STANDARDIZED FIELD SOBRIETY TESTING (2002) VIII-19.  (hereafter in the form "NHTSA VIII-19").

There is no indication that Defendant Marsh first checked for equal tracking, equal pupil size, and resting nystagmus, as set forth in NHTSA VIII-5.

a.     <u>Improper</u> <u>Environment</u> <u>for</u> <u>Administration</u>

The Horizontal Gaze Nystagmus field sobriety test ("HGN") measures the involuntary jerking of the eyes.  The test should not be performed where there are visual or other distractions, such as rotating police lights or strobe lights or traffic passing in close proximity.  NHTSA VIII-15.  Defendant Marsh tried to administer the test twice.  The first time, Ms. Callum was still seated in her vehicle.  The second time, Ms. Callum

was standing facing away from the police cruisers' overhead strobe lights.  Even if she was faced away from those distractions, at that time of night the lights would be visible and distracting as intermittent lightening and darkening of the area.

The dark environment lit by the lights of the police vehicles may have produced a disabling glare that would negatively affect the results of the HJGN.

   b.    Inability to Determine Validity of Administration of HGN

In order to determine the validity or the reliability of the standard field sobriety test as administered by a particular individual, the court must know precisely the manner in which the HGN was conducted.  The tests are accurate only when administered "in the prescribed, standardized manner … If any one of the standardized field sobriety test elements is changed, the validity is compromised."  NHTSA VIII-19.

In the present case, there is no evidence as to how the HGN standardized field test was conducted.

For the HGN, NHTSA directs the following steps:

1. always start with the left eye (NHTSA VIII-6);

2. give verbal instructions to keep head still and follow stimulus with eyes only and keep following the stimulus with eyes until told to stop (NHTSA VIII-6);

3. position stylus 12" to 15" in front of suspect's eyes, as differing distances determine where the 45 degree angle occurs.  (NTHSA VIII-6); and

4. use contrasting stimulus as stylus; (NHTSA VIII-8)

In the present case, there is no evidence in the record as to which eye Defendant Marsh commenced with testing.  Defendant Marsh does not state where he positioned the stylus, which is critical to measuring the 45 degree angle.

Also, each eye is to be separately evaluated through the HGN.  Here, there is no indication that each eye was separately examined and evaluated.

     c.    Lack of Foundation for Scientific Evidence

Finally, the HGN test should be excluded from consideration because the State has shown no foundation for it.  The Horizontal Gaze Nystagmus field sobriety test and its results are based on a scientific principle – that there is a discernable correlation between nystagmus and alcohol consumption.  The scientific and theoretical nature of the HGN test and its results has the potential to mislead factfinders in the absence of a foundation establishing whether scientific evidence is reliable, including (1) whether HGN can be, and has been, tested;  (2) whether HGN has been subjected to peer review and publication;  (3) the known or potential rate of error, including the existence and maintenance of standards controlling the technique's operation;  and (4) whether HGN is, in fact, generally accepted in the relevant scientific community.  State v. Russo, 62 Conn.App. 129, 135, 773 A.2d 965 (2001); State v. Pjura, 68 Conn.App. 119,  789 A.2d 1124 (2001).  That foundation has not been set forth here.

Because the environment in which the HGN was administered could have impacted the results, because it is unknown whether Trooper Marsh properly

administered the HGN, and because the HGN test lacks scientific reliability, the HGN

field sobriety test should not be considered by the court in determining whether there

was probable cause to find that Ms. Callum was under the influence of intoxicants.

The validity of the other standardized field sobriety tests also is questionable.

Defendant Marsh asserts that the field sobriety tests "were explained and demonstrated

several times."

The Walk and Turn test is initiated by giving verbal instructions, accompanied by

demonstrations.  NHTSA VIII-9.  Although Defendant Marsh states that he explained

and demonstrated each test, he does not specify the instructions given to Ms. Callum.

If Ms. Callum was not given full and complete instructions, she may have inadvertently

performed incorrectly, especially given her overwrought state.

> A. [Callum]    At that point he said, yes, walk, you know, the line.  And then
> when you get to the end of the line, make a pivot.
> ….
> He said make a pivot.  I really didn't understand what a pivot was, but then
> I think back and I said I heard that word when they're playing baseball.  And then
> I said pivot, and he said – he showed me.  He said make a sharp turn.
> Q    He demonstrated what he meant by pivot?
> A.    Yes.
> Q,    Did he also demonstrate what he meant by walking one foot in front
> of the other?
> A.    No.
> Q.    He didn't show you how to do that?
> A.    No.
> Q.    He just explained to you how to do that?
> A.    Yes.
> Q.    Did he tell you how many steps to take?
> A.    Not that I can recall.

Exhibit. A, Deposition <u>Callum</u> pp. 67-68.

The One Leg Stand test is initiated by giving verbal instructions, accompanied by demonstrations.  NHTSA VIII-12.  Although Defendant Marsh states that he explained and demonstrated each test, he does not specify the instructions given to Ms. Callum. If Ms. Callum was not given full and complete instructions, she may have inadvertently performed incorrectly, especially given her overwrought state.  Ms. Callum states that she was told to "stand on one leg."  Exhibit. A, Deposition. <u>Callum</u>, pp. 61, 63-65. Although she repeatedly tried to warm her hands by putting them in her coat pocket, she was told only to keep her hands out of her pockets but she was not given any reason for that.

The Standardized Field Sobriety Tests are only as reliable as the manner in which they are administered.  Ms. Callum has testified that the field tests were not administered in accordance with NHTSA standards.  Trooper Kelley relied upon the standardized field sobriety tests to determine probable cause to arrest.  Police Report. Ms. Callum's testimony raises a material issue as to the validity of those tests.  Trooper Kelley presumably was aware of the proper method of administering and scoring the Standardized Field Sobriety Tests.  There is a material issue whether Trooper Kelley had probable cause to arrest Ms. Callum based on the Standardized Field Sobriety Tests.

The Defendants cite eight factors outside the Standardized Field Sobriety tests that they claim, in total, give probable cause to arrest Ms. Callum for DUI:

(1)    the plaintiff was speeding;

(2)    she did not immediately stop her car when signaled to do so by Trooper Marsh;

(3)    her eyes were glassy;

(4)    she was coming from the Foxwoods Casino late at night

(5)    she did not complete the horizontal gaze nystagmus test;

(6)    she appeared wobbly in the driver's seat of her vehicle when being interviewed by Trooper Marsh;

(7)    it took her five minutes to locate her driver's license and registration when asked to do so, and

(8)    she was unable to successfully count backwards from 2,000 when asked to do so.

There are material differences of fact as to whether Ms. Callum was speeding, *infra*. As already discussed, there are material differences as to whether she had the ability to safely pull over prior to when she did so and whether Defendant Marsh knew that.

In addition, Defendant Johnson disputes that Ms. Callum's eyes were glassy. Exhibit. D, Johnson Responses, question 15. Even accepting Defendant Marsh's version of the Horizontal Gaze Nystagmus test, the test was improperly administered.

11

Ms. Callum was not even aware she was being tested.  Only Defendant Marsh seemed

to think Ms. Callum took a suspiciously long time to produce the requested documents.

After being exposed to the frigid air for over a half hour and being harangued by a state

trooper the entire while, Ms. Callum was unable to count backwards from 2,000.

Exhibit. A, Deposition. Callum pp. 68-69.  Under the circumstances Defendant Marsh

should have known the backward count was not reliable.

Under the best of circumstances, then, the parties agree that Ms. Callum was

returning from Foxwoods Casino, that she was wobbly in her seat after the verbal

barrage from Defendant Marsh, and that she was unable to count backwards from

2,000 after being exposed to frigid temperatures without the benefit of gloves and being

so intimidated by Defendant Marsh who was "mean."  Exhibit. B, deposition. Eubanks,

p. 18.

Most citizens would be astonished to learn that returning from a casino gives rise

to probable cause to arrest for intoxication, especially after being brow-beaten into tears

by a state trooper.  Defendant Marsh lacked probable cause to arrest Ms. Callum for

driving under the influence of drugs or alcohol.

Ms. Callum also was charged with two minor offenses:  speeding and operating a

motor vehicle outside of her license restrictions (corrective lenses required).

There is a dispute as to whether Ms. Callum was speeding.  Defendant Marsh

states that he clocked with a laser gun Ms. Callum traveling at a speed of 78 mph in a

65 mph speed zone.  Police Report.  Ms. Callum denies she was traveling that fast.

Exhibit. A, Deposition. <u>Callum</u> pp. 33-35.  Her passenger agrees that Ms. Callum did not

appear to be speeding, rather that Ms. Callum appeared to be traveling with the flow of

traffic.  Exhibit. B, Deposition. <u>Eubanks</u>, p.14-15.  Thus, a difference of material fact

exists and summary judgment on whether Trooper Kelley had probable cause to arrest

Ms. Callum for speeding is not appropriate.

Defendant Marsh states that at "0011" hours, Ms. Callum was placed under

arrest for operating outside the restrictions of her license (corrective lenses)."  Police

Report.  However, at that time, Defendant Marsh apparently was not aware of any such

violation.  Defendant Johnson states that she was the one to notice the apparent

violation during the course of processing Ms. Callum at Troop K and that the charge

was then added.  Exhibit C to Defendants' Memorandum of Law, Affidavit of Gudrun

Johnson, paragraph 8.

In any event, the fact that an arrest may have been justified for a very minor

traffic offense should not dispose of Ms. Callum's serious allegations of violations of her

Fourth Amendment rights.  The State of Connecticut and the Second Circuit apparently

have not considered the issue, but a number of other jurisdictions considering the issue

have held that justification for arrest on a very minor motor vehicle violation should not

preclude a § 1983 action for violation of Fourth Amendment rights and have

13

distinguished *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536, 149 L.Ed.2d 549 (2001).

In *Atwater*, the Texas statute that gave the officer authority to arrest stated that "Any peace officer may arrest without warrant a person found committing a violation of this subtitle [Rules of the Road]."  Tex. Transp. Code Ann.  § 543.001.  A Montana court found that since the relevant Montana statute differed, an analysis under Montana law was prudent.  "Section 46-6-310(1) MCA provides that 'whenever a peace officer is authorized to arrest a person without a warrant, the officer may instead issue the person a notice to appear.'   Section 46-6-311(1), MCA, states that 'a peace officer may arrest a person when a warrant has not been issued if the officer has probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require immediate arrest.' … Although the statutory scheme gives officers discretion to either arrest or issue a notice to appear, §  46-6-311(1), MCA, specifically states that there must also be "existing circumstances requir[ing] immediate arrest."  *State v. Bauer*, 307 Mon. 105, 36 P.3d 892, 895-96 (2001).  The court found that there were no circumstances requiring immediate arrest. *See also Garrett v. City of Bossier City*, 792 So.2d 24 (La.App. 2 Cir 2001), *State v. Brown*, 99 Ohio St.3d 323, 792 N.E.2d 175 (2003); *State v Askerooth*,: 681 N.W.2d 353 (Minn. 2004).

Connecticut law is also distinguished from the facts of *Atwater*.  The Connecticut

constitution provides in Article I, section 9 that "No person shall be arrested, detained or punished, except in cases clearly warranted by law."  When interpreting that state constitutional provision,  the specific content appropriately to be assigned to the phrase "clearly warranted by law" depends on the particular liberty interest that is at stake. *State v. Lamme,* 216 Conn. 172, 579 A.2d 484 (1990); *State v. Bjorklund,* 79 Conn.App. 535, 830 A.2d 1141 (2003).

Any person who violates Conn. Gen. Stat. § 14-36, which includes operating outside the restrictions of a license, commits an infraction.  Conn. Gen. Stat. § 14-36(g).  Conn. Gen. Stat. § 53a-24 provides that offense means "any crime or violation which constitutes a breach of any law of this state or any other state, federal law or local law or ordinance of a political subdivision of this state, …, except one that defines a motor vehicle violation or is deemed to be an infraction. The term "crime" comprises felonies and misdemeanors. Every offense which is not a "crime" is a "violation". **Conviction of a violation shall not give rise to any disability or legal disadvantage based on conviction of a criminal offense**."  (emphasis added)  The language of Conn. Gen. Stat. § 53a-24 indicates that the infraction of driving outside the restriction of a license does not give rise to a "crime" that would prevent a § 1983 action.

Summary judgment should not enter for the defendants on the issue of probable cause.

15

**2.    The Defendant Used Excessive Force on the Plaintiff During the Course of Her Arrest**

The parties agree that Defendant Marsh snatched a hat from Ms. Callum's head and shoved her into a holding cell.

An arrestee's testimony that the arresting officer subjected him to "rough treatment" presented a triable issue of unreasonable force. *Armao v. American Honda Motor Co*., 917 F. Supp. 142, 144 (D. Conn. 1966). The extent of an injury is not a crucial factor in determining whether the amount of force used in a particular case is unreasonable. *Bass v. Robinson*, 167 F.3d 1041, 1046 n. 1 (6th Cir. 1999). Whether the force used in any case is unreasonable must almost always be determined by a jury and not by a court on summary judgment. "Reasonabless under the Fourth Amendment resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment….[S]ince we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared." *Abraham v. Raso*, 183 F.3d 279, 289-90 (3d Cir. 1999).

At the time the excessive force occurred at the barracks, Ms. Callum was surrounded by state troopers. She posed no threat to anyone. Nothing in her behavior suggested she was resisting arrest or attempting to evade arrest by flight. There was

16

absolutely no reason for the state troopers to use any force whatsoever on Ms. Callum.

In some circumstances -- including the circumstances at issue here -- *no* use of force is

permitted because none is required. *Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1996); *Kidd*

*v. O'Neil*, 774 F.2d 1252 (4th Cir.); *Bauer v. Norris,* 713 F.2d 408 (8th Cir. 1983). Where

the governmental interests in using force are weak or nonexistent, even a slight injury

may be sufficient to establish a Fourth Amendment violation. *Slicker v. Jackson*, 2165

F.3d 1225 (11th Cir 2000)(reversing judgment of dismissal upon finding that "actual

injury" does not required proof of monetary loss).


**3.     Commissioner Spada is Liable to the Plaintiff for Violation of her Fourth Amendment Rights**

It is well established that supervisory officials may not be held liable solely on the

basis of respondeat superior. *See, Monell v. Department of Social Services*, 436 U.S.

658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978). In order to establish the

liability of a supervisory official in an action under Section 1983 for unconstitutional acts

by its employees, a plaintiff must show that the violation of her constitutional rights

resulted from an actual or tacitly approved custom or policy. *Powell v. Gardner*, 891 F.

2d 1039, 1045 (2nd Cir. 1989).

A single decision by policy makers may subject them to liability under appropriate

circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 478, 480, 106 S. Ct. 1292,

17

1298, 89 L.Ed. 2d 452 (1986). In *Leatherman v. Farrant County*, 507 U.S. 163 (1993), the court rejected heightened pleading requirements for counts alleging supervisory liability. In fact, a plaintiff is not required to allege more than one incident of misconduct to support an allegation of supervisory policy or custom. *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 479-80 (7th Cir. 1997).

"If the decision to adopt that particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policies, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly. " *Id*. 475 U.S. 481, 106 S. Ct. 1299.

Such policy or custom may include inadequate training or supervision which becomes the moving force behind the constitutional violation. *See* for example, *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), *supra* (County prosecutor gave order that resulted in constitutional violation); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (decision of city counsel to cancel license permitting concert directly violated constitutional rights); *Owen v. City of Independence*, 441 U.S. 622 (1980) (city council discharged employee without due process). In such cases, there are no real problems with respect to the issues of fault or causation. *See also Bennett v. Pippin*, 74 F.3d 578, 586 & n.5 (5th Cir. 1996) (County held liable for Sheriff's rape of murder

18

suspect, where Sheriff was final policymaker in matters of law enforcement).

In *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), Plaintiff offered no

evidence of misconduct by officers of the department prior to the evening in question.

The court found however, that there were several examples of reckless misbehavior

during the incident involving Plaintiff's decedent.  More significantly, the court relied on

the complete failure to the police department to investigate the incident, or to discipline

any of the officers involved, in order to establish the informal policy of the department:

> The disposition of the policymaker may be inferred from his conduct after the events of that night.  Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error.  The officers testified at the trial that no changes had been made in their policies.  If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to concluded that it was accepted as the way things are done and have been done in the City of Borger.  If prior policy had been violated we would expect to see a different reaction.  If what the officers did and failed to do on [the date of the incident] was not acceptable to the police chief, changes would have been made.
> "Thisreaction . . .  says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force."

*Id.* at 171.

The First Circuit has also held that evidence of misconduct by officers during the

event which gave rise to suit may be used as some evidence of the existence of a policy

or custom which caused the constitutional violation.  In *Bordanaro v. McLeod*, 871 F.2d

1151 (1st Cir. 1985), the court held that where there is some independent evidence of

the existence of an improper practice, the facts of the incident on trial may be relied

19

upon as additional proof of the practice.  The court concluded that where the incident involved the joint actions of the entire night watch of the police department, it was a reasonable inference that all the officers were operating under a shared set of rules and customs.  The court also held that it was proper to admit evidence of the city's failure to investigate the incident properly and to discipline the officers involved, as some evidence of what customs or policies were in effect in the city at the time of the incident.

In addition to establishing a policy or custom based on acquiescence in unconstitutional conditions, a Plaintiff must show that such acquiescence was a proximate cause of the violation.  In *Spell v. McDaniel*, 824 F.2d 1380, 1391, the court held that the causal link is shown if "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom. "

In the instant case, there is evidence that officers received inadequate training in a number of areas.  DUI enforcement is a major duty of Connecticut law enforcement officers, yet Ms. Callum and her companions were stopped, questioned and detained without any probable cause or factors generally considered to raise suspicion of drug or alcohol influence.  Accusations were immediately leveled without any facts or suspicions behind them.  The Standardized Field Sobriety tests were improperly administered and scored.   Although at least one individual defendant was told that the plaintiff was a diabetic, and the defendant did not smell any odor of alcohol about the plaintiff, the defendant failed to consider any alternative other than the influence of alcohol or drugs.

20

Police Report.  At Troop K, another defendant observed that the plaintiff did not smell of alcohol, and that her eyes were not glassy or bloodshot.  Ex. D,  Gudrun Johnson's Responses, question 15.

Other officers failed to intervene when it was clear the stop and arrest were unlawful.  The individual defendants acknowledged that there has been no investigation much less disciplinary action in connection with their conduct during the course of this incident.  See Exhibit A to Defendants' Memorandum of Law, Joseph Marsh's Responses to Plaintiff's Interrogatories and Requests for Production, Inspection and Examination, question 9.  In addition, the Revised Amended Complaint specifically alleges that Defendant Arthur Spada:

   a.   failed or refused to promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures or customs regarding detentions, searches and arrests of citizens by state police troopers;

   b.   failed or refused to promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures or customs regarding the use of force against citizens by state police troopers;

   c.   failed or refused to promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures or customs regarding sobriety field testing and/or drug testing of persons in official custody by state police troopers;

   d.   failed or refused to adequately screen, hire and retain candidates for the position of state police troopers;

   e.   failed or refused to adequately train state police troopers in the performance of their duties and conduct towards citizens; and

   f.   failed or refused to adequately supervise state police troopers in the

21

g.      performance of their duties and conduct towards citizens; and failed or refused to take appropriate disciplinary action against the defendant troopers for the negligent, reckless, malicious, deliberate, indifferent, willful, intentional and unlawful conduct complained of.

These are specific instances of failure by Defendant Arthur Spada himself.  As alleged above, he failed to ensure that the troopers were properly trained in the conduct of sobriety field testing and/or drug testing; in their conduct towards citizens; and he failed to institute provisions for supervising their conduct.  Thus, questions exist as to the adequacy of training in the detection of drivers under the influence of alcohol or drug, in the treatment of citizens with medical conditions, and in officers' duties to prevent other officers from violating the civil rights of civilians.   "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Canton v. Harris*, 489 U.S. 378, 390 (1988).

Accordingly, open factual issues presently exist as to whether the lack of adequate training guidance and/or supervision provided to the individual defendants by the Defendant Arthur Spada evidence any municipal policy which was the moving force behind the violation of Joan Callum's constitutional rights.

Thus, the defendant Arthur Spada is not entitled to summary judgment on this issue.

**4.    State Police Defendants are not Entitled to Sovereign or Statutory Immunity from Liability for the State Constitutional and Common Law Claims**

**A.    Sovereign Immunity**

Sovereign immunity does not bar suits against state officials personally.  In *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358 (1991), the Court expressly held that, regardless of the fact that they acted within their office, state officials sued in their personal capacities are not entitled to sovereign immunity.  The Defendants allege that, based on the tests set forth in *Miller v. Egan*, 265 Conn. 301, 828 A.2d 549 (1003) this suit is actually a suit is actually a suit against the state and thus is barred by the doctrine of sovereign immunity.  *Miller* questioned whether  (1) a state official has been sued; (2) the suit concerns some matter in which that official represents the state;  (3) the state is the real party against whom relief is sought;  and (4) the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability.  *Id*. at 556.  It is the third prong of the test that is at issue here:  If a reading of the complaint indicates, inter alia that the state is the real party against whom relief is sought, then the state is deemed the real defendant and the matter is barred by sovereign immunity.

A reading of the Revised Amended Complaint indicates that the state is not the real party against whom relief is sought.  The Revised Amended Complaint makes clear that the defendants are being sued in their individual as well as official capacities.  The complaint alleges that the defendants acted recklessly, maliciously, deliberately,

23

indifferently and unlawfully.  Neither Conn. Gen. Stat. § 29-8a or § 5-141d obligates the state to save harmless and indemnify any state officer, employee or state policemen from actions arising from wanton, reckless or malicious acts.  Thus, the Revised Amended Complaint seeks recovery from the defendants in their individual capacities, not simply their official capacities.  The state is not the real party against whom relief is sought.

**B.**     **Statutory Immunity**

The Defendants allege that even if they are not entitled to sovereign immunity, they are entitled to statutory immunity pursuant to Conn. Gen. Stat. § 4-165.[1]  "State employees do not have statutory immunity for wanton, reckless or malicious actions, or for actions not performed within the scope of their employment. For those actions, they may be held personally liable, and a plaintiff who has been injured by such actions is free to bring an action against the individual employee." *Miller v Egan, supra*., at 319. Ms. Callum has alleged and developed sufficient facts to support a conclusion that that the defendants were acting outside the scope of their employment or wantonly, recklessly or maliciously.[2]  *See Martin v Brady*, 261 Conn. 372, 802 A.2d 814 (2002).

---

[1]Sec. 4-165.  No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment

[2] The Defendants repeatedly state that the Revised Amended Complaint is devoid of allegations of wanton, reckless or malicious conduct, citing *Martin v Brady*, 261 Conn. 372, 802 A.2d 814 (2002).  The *Martin* case, however, concerned a Motion to Dismiss, in which the court was examining the sufficiency of the allegations of the complaint.  This matter concerns a motion for summary judgment in which the court will be looking at all the available evidence presented by the parties.

The Revised Amended Complaint alleges that Ms. Callum was stopped, detained and arrested without probable cause, that excessive and unreasonable force were used against her, and that she was maliciously prosecuted. The Defendants claim that the temporary detention, investigation and apprehension of a suspect falls squarely within the statutory duties of our state police officers.

This action does not concern solely the temporary detention, investigation and apprehension of a suspect. It concerns matters both occurring and subsequent to the detention, investigation and apprehension of Ms. Callum. It concerns the evidence that the detention was not "temporary," but unduly prolonged.

Other troopers at the scene acknowledged that there was no basis for a DUI arrest. Exhibit. B, Dep. of Eubanks, p. 35. Trooper Johnson did not detect any signs of intoxication or drug influence that were cited by Trooper Kelley. Exibit. D, Johnson Responses, question 15. When the toxicology results were returned to Troop K, there was no effort to cease the prosecution of the DUI claim against Ms. Callum notwithstanding the clear evidence that she was not under the influence of any drug. As the incident concerning Ms. Callum developed and it became more and more clear that she was not operating under the influence of any drug, the actions of the Defendants in pursuing criminal claims against Ms. Callum wreak of maliciousness and desperation to conceal unlawful actions.

The Defendants are not entitled to sovereign and/or statutory immunity on the pendent state claims and summary judgment should not enter at this time.

**5.    Material Issues Remain with Respect to Plaintiff's Claims for Malicious Prosecution**

As set forth in the preceding sections, material questions of fact are in dispute as to whether the Defendants had probable cause to arrest Ms. Callum, used unreasonable force against Ms. Callum and failed to terminate legal proceedings against her when the evidence became incontrovertible.  There is no dispute that the Defendants initiated or procured the institution of criminal proceedings against Ms. Callum.  There is no dispute that the proceedings terminated completely in Ms. Callum's favor.  Ms. Callum has presented evidence that the defendant acted with malice in continuing to prosecute her when other troopers were aware that probable cause did not exist and when the objective evidence confirmed that there was no evidence of drug influence.

Although Defendant Johnson was not involved in the initial stop of Ms. Callum, she was integrally involved in the investigation, including the collection of a urine sample.  At no time did Defendant Johnson observe glassy eyes, odor of alcohol, or erratic behavior that might indicate drug use.  Yet, Defendant Johnson took no steps to intervene on Ms. Callum's behalf or to question the propriety of the arrest.

Because the Defendants lacked probable cause to arrest Ms. Callum and failed at various points throughout the matter to acknowledge their errors and cease

26

proceedings against Ms. Callum, the Defendants are not entitled to Summary Judgment on this claim.

**6.    Material Issues are Disputed with Respect to Plaintiff's Claims for Abuse of Process**

As stated previously throughout this memorandum, the Defendants lacked probable cause to arrest Ms. Callum and the Defendants had ample opportunities to cease their prosecution of her.  However, having set in motion the stop and detention of Ms. Callum, Defendant Marsh and the other Defendants continued their prosecution of her in order to somehow "justify" her detention and arrest.  Continuing their prosecution of Ms. Callum in the face of overwhelming evidence supporting her claims to justify the stop and arrest is using the legal process "to accomplish a purpose for which it is not designed."  *See Mozzocki v. Beck*, 204 Conn. 490, 529 A.2d 171 (1987).

**7.    Plaintiff's State Law Claims Should Not Be Dismissed**

Because summary judgment  should not be entered in this matter on any of Ms. Callum's claims, there is no reason for this court to dismiss the state law claims.  Such a dismissal would result in the inefficient hearing of the §1983 claims in federal court while the same facts are being heard in the state court on the malicious prosecution and abuse of process claims.  The state law claims should not be dismissed.

**C.    CONCLUSION**

Based on the foregoing, the Plaintiff hereby requests that the Court deny the

Defendants' Motion for Summary Judgment.

**PLAINTIFF,
JOAN CALLUM**

**BY:** _____
**A. Paul Spinella, Esq.
SPINELLA & ASSOCIATES
Federal Bar #: ct00078
One Lewis Street
Hartford, Connecticut 06103
Tel  (860) 728-4900
Fax (860) 728-4909**

**<u>CERTIFICATION</u>**

I certify that a copy of the foregoing has been mailed first class, postage prepaid, on the
above date to:

Stephen R. Sarnoski, Esq.
Assistant Attorney General
MacKenzie Hall
110 Sherman Street
Hartford, CT 06105

_____
A. Paul Spinella

28